# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA     :
                                         :

      v.                               :         **CRIMINAL ACTION FILE**
                                         :         **NO. 1:10-CR-035-RWS/AJB**

MARCIEL VILLAVERDE-LEYVA     :
and ADRIAN CONDONOZO[1],     :
                                         :

        **Defendant.**         :

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND
## <u>FINAL REPORT AND RECOMMENDATION</u>

Before the Court are the following pretrial motions:

(1)    Marciel Villaverde-Leyva's motion to suppress statements, [Doc. 31];

(2)    Marciel Villaverde-Leyva's motion to suppress evidence and statements, [Doc. 33];

(3)    Marciel Villaverde-Leyva's motion to sever defendants, [Doc. 34];

(4)    Marciel Villaverde-Leyva's motion to suppress evidence and statements (Rule 404(b)), [Doc. 40]; and

---

[1]    Although indicted as "Condonozo," the parties appear to agree that the correct spelling of this defendant's name is "Candanazo." The Court will use that latter spelling throughout this Report and Recommendation.

(5)     Marciel Villaverde-Leyva's supplemental motion to suppress evidence and statements, [Doc. 41]. [2, 3]

In a May 5, 2010, Order, [Doc. 53], the Court held that Villaverde-Leyva (hereinafter "Villaverde") was not entitled to an evidentiary hearing as to his motion to suppress evidence as it related to the search of the residence pursuant to a federal search warrant, but that he could brief any issues as to his motion to suppress evidence and the Court would fully address the motion in the final Report and Recommendation. Also, on August 13, 2010, the Court orally denied Villaverde an evidentiary hearing on his motion to suppress, [Doc. 40], relative to the traffic stop of a vehicle in 2008, the fruits of which the government intends to offer as evidence against Villaverde under Federal Rule of Criminal Procedure 404(b). [Doc. 69]. The Court sets out its rationale for its oral ruling in this Report and Recommendation.

The Court held an evidentiary hearing on the defendant's motions to suppress statements on July 13, 2010, [Docs. 56], after which the transcript was prepared and

---

[2]     The Court previously denied Villaverde's motion for disclosure of the confidential informant. [Doc. 29]. [*See* Doc. 35].

[3]     Adrian Candanazo's motion to suppress statements, [Doc. 25], was withdrawn on October 12, 2010. [*See* Doc. 76]. As a result, the Clerk is **DIRECTED** to **TERMINATE** that motion. A motion to suppress evidence filed by Defendant Candanazo, [Doc. 26], was withdrawn before the evidentiary hearing. [Doc. 60 at 2].

2

filed.   [Doc. 60 (hereinafter T___)].   The parties filed post-evidentiary hearing briefs.  [Doc. 71 (Government); Doc. 79 (Villaverde)].  The Government did not file a reply brief.

### Evidence and statements obtained on January 21, 2010

#### Facts

On January 21, 2010, ICE Special Agents and other law enforcement officers were preparing to execute a federal search warrant at 3409 Ridgecrest Road in Smyrna, Georgia, based upon the expected delivery by a confidential informant of a quantity of liquid methamphetamine to that location.  T11.

The search warrant was obtained by ICE SA Andre Kenneybrew at 2:55 pm that date when it was issued by Magistrate Judge Hagy.  The warrant authorized the executing agents to search the "real property, outbuildings, and vehicles" at the location on or before January 22, 2010.  [Doc. 41-3 at 2].  However, the date "December 11, 2009" was preprinted on the jurat lines of both the warrant and the application.  [*Id.* at 2, 3].

#### Application for the search warrant

The application was supported by SA Kenneybrew's affidavit, which contained the following facts in support of the request to have the warrant issued.  In December

AO 72A
(Rev.8/8
2)

2009, ICE SA Engle was contacted by Major Willard of the Marietta Cobb Smyrna Narcotics Unit (MCS). Willard stated that his unit had been investigating "Marco Villaverde" based on information received from the Texas Department of Public Safety (TDPS). On December 9, 2009, TDPS arrested a soon-to-be confidential source (CS) in possession of $12,000, a firearm and 17 grams of methamphetamine, but the CS was not going to be prosecuted in exchange for assistance. The CS also might obtain a monetary reward. The CS stated that since June 2009, s/he had smuggled vehicles containing liquid methamphetamine from Clemente Estrada in Mexico and delivered them to Houston and Atlanta. The CS's contact in Atlanta was Marco Villaverde. The CS received between $600 and $3000 per trip and returned to Mexico with $12,000 to pay the persons who loaded Jeep Liberty vehicles which were used for smuggling the methamphetamine into the United States. [Doc. 41-3 at 8-9].

The application continued that the CS stated that liquid methamphetamine was delivered in Atlanta to an Hispanic male named "Marcos" at a residence described by the CS. Using the CS's directions, an MCS agent located a residence matching the description given by the CS. The CS stated that Marcos was on probation, had a tattoo on his left arm ("Echos Mexico"), and his wife drove a silver PT Cruiser. [*Id.* at 10].

4

MCS agents surveilled the residence and observed a maroon Chevy Tahoe and a silver PT Cruiser, both registered to Charlene Villaverde ("Charlene") at that address. The water service at that address was in her name as well. Charlene's drivers licence photograph and a Cobb County Sheriff's Office book-in photograph of a "Charlene Alpert" showed the same person. Under that latter name, Charlene was arrested in July 1998 and charged with possession of cocaine. In November 2007, she was arrested for having a trafficking quantity of methamphetamine in her purse. A separate investigation also resulted in her conviction for intent to possess methamphetamine. [*Id.* at 10-11].

During December 2009, MCS surveilled the residence and saw 5 vehicles, including the aforementioned PT Cruiser and Tahoe, all of which were registered to Charlene. [*Id.* at 11-12]. Then, on January 5, 2010, police observed a Jeep Liberty arrive at the residence and several vehicles were moved so that the Jeep could be parked at the rear of the house. The next day, officers saw a male and female arrive in a Honda, and a gallon-sized container containing a liquid with a reddish tint was removed from the trunk. (Kenneybrew knew that liquid methamphetamine had a reddish or brown tint.) The driver of the Honda had a prior misdemeanor drug conviction. [*Id.* at 12-13].

5

The surveillance agents also saw individuals traveling from the residence to the outbuildings on the property, which suggested that these structures also were used in drug distribution. [*Id.* at 13].

On January 19, 2010, TDPS informed MCS that the CS was traveling to the residence in a Jeep Liberty to deliver 15.2 pounds of liquid methamphetamine. Agents prepared for a controlled delivery of the substance to the residence. On January 21, 2010, the CS delivered the liquid methamphetamine to the residence. [*Id.* at 13-14].

### *Additional information from the CS*

In addition to the information from the CS related in the application for the search warrant, ICE agents also were aware of the following information. The CS had numerous interactions with Villaverde. On one occasion, the CS was in contact with persons at the residence daily for three weeks. Also, the CS related that s/he stayed at the Ridgecrest residence. T144. The CS showed law enforcement the controlled substances the CS was asked to smuggle into and deliver in the United States. T145. In addition, the CS's telephone conversations with the source in Mexico and Villaverde were monitored and recorded. T146.

6

*Execution of the search warrant and questioning of the defendants*

On January 21, 2010, the surveilling agents at 3409 Ridgecrest were advised by Kenneybrew that he received the search warrant shortly after 2:55 pm that date.  T82. At 5:30 pm, the agents began executing the warrant after an individual whom the agents believed could possibly be transporting the drugs from the residence left the residence. That individual was stopped and found not to be carrying any contraband, but the agents were concerned that the person would signal the residence's occupants about their presence.  T12, 82-83.  The executing agents did not have the search warrant in hand until some time later, but Engle, who was one of the lead agents on the scene, had drafted the search warrant application.  T158; Deft. Exh. 1 at 5.

At the time of the execution of the search warrant, the vehicle in which the CS arrived was parked in the driveway in the backyard.  T11, 14, 86.  The surveilling agents had seen unidentified males working around that Jeep Liberty, but the privacy fence obscured the agents' ability to specifically identify those individuals.  T150; Deft. Exh. 1.

In executing the search warrant, the agents drove their vehicles, both marked and unmarked cars, onto the property.  T44, 84.  The marked vehicles illuminated their police lights so that the residence's occupants would know that the police, as opposed

7

to someone attempting to rob them, were on the scene.  T85.  The executing team was comprised of ICE SAS Beamish and Engle and 10 other agents.  T12, 15, 84.  MCS agents secured the outside of the residence.  T84.   Each agent executing the search warrant was armed and wearing a raid vest with a law enforcement designation.  T84-85.  Two agents had long guns.  T15, 85, 89.  At the time of the entry onto the property and into the residence, all of the agents had their weapons drawn.  T15-16.

As noted, the backyard was partially obstructed from view by a privacy fence. T86.  Due to the activity the agents had seen in the backyard, the entry team started executing the warrant from the rear of the house.  T86.  After entering the yard, Engle knocked on the backdoor and announced their presence as police officers with a search warrant.  T87, 89.  Some of the agents apprehended individuals in the backyard (later identified as Ephram Villaverde (defendant Villaverde's brother) and Nick Pena) and others went to the outbuilding, described as a shed.  T87, 101.  Engle saw movement inside the residence and made entry through the unlocked backdoor.  T89.  Engle, who led the agents into the residence, was yelling "police" and "search warrant" and ordering people to get down.  T69-70, 87.  Charlene, Candanazo and the CS were seen in a sunken living room and detained.  T90.

8

Defendant Villaverde was located in the kitchen.  T92.  He had a shocked look on his face and was asking what was going on.  T94.  He complied with commands to raise his hands.  T149.  Agent Whitlock put Villaverde on the floor as he secured him with handcuffs.  T95, 148.  At this point, Villaverde's young son (2 1/2 to 3 years of age) came into the kitchen from the bedroom and was crying.  T94, 151.  Engle grabbed the child and placed him near Villaverde.  T95.  Beamish entered the kitchen as Villaverde was being handcuffed while prone on the kitchen floor.  T17, 45.[4] Villaverde's son was beside Villaverde and still crying.  T17, 45.  Once handcuffed, Villaverde was stood up.  T47, 50.  Beamish had pointed his weapon at Villaverde for about 30 seconds until Villaverde was handcuffed by Whitlock.  T46-47.  After Villaverde was secured, his son reached for Beamish.  Beamish removed his raid vest, took his other gear off and picked up the child.  T18-19.  Because the child was crying, Beamish took him back to Villaverde for Villaverde to calm him.  T47-48.  After the child calmed down, Beamish carried the child around the house for a while.  T19, 106.

The entry and securing of the residence took a couple of minutes, after which the agents' sidearms were re-holstered, they removed their raid vests,  and the long guns

---

[4]     On the date the search warrant was executed, Villaverde had not been seen until the agents entered the residence.  T43.

were secured in the agents' vehicles.  T16, 21, 99, 105.  Since the occupants in the

house were compliant, once the house was secured, the agents did not raise their voices

nor draw their weapons again.  T14, 104.

The liquid methamphetamine delivered by the CS was found in the outbuilding

behind the residence.  Govt. Exh. 1 at 11.  A Western Union receipt in Candanazo's

name showing that $300 wired to the CS on January 19, 2010, was located on the front

seat of the maroon Chevy Tahoe.  *Id.*

A few minutes after the residence was secured, those who had been detained

were brought into the kitchen and seated at the table, including Charlene (the child's

mother), the CS, and Ephram Villaverde.  T19-20.  Defendants Villaverde and

Candanazo were moved to the couch in the living room, where they were watched by

at least one agent.  T102, 153.  They were both handcuffed.  T102-103.  Beamish and

Engle began interviewing each detainee in a bedroom, starting with Charlene, while at

least one other agent guarded the remaining persons at the kitchen table.  T20.

The bedroom was 10 X 12 feet and filled with bedroom furniture.  T53.  It had

one window.  T52.  During her interview, Charlene was holding her child.  T107.  She

admitted that she knew her husband sold methamphetamine.  T109.  She also referred

to the outbuilding in the backyard as Villaverde's "man cave."  Deft. Exh. 1 at 7.

10

Charlene's interview took 23 minutes, after which she was returned to the kitchen with her child.  T20, 22, 108.

Beamish and Engle interviewed each occupant in a similar fashion, with Villaverde being the last person interviewed.  T23.

Candanazo was interviewed beginning at 6:09 pm.  T64, 111.[5]  His handcuffs were removed when he was brought into the bedroom.  T24, 66.  During his first interview, Candanazo was seated on the bed.  T76.  Like the other interviews, the bedroom door was shut.  T24.  Engle stood and Beamish paced and occasionally sat at the other end of the bed from Candanazo.  T25, 70-71.  Neither agent loomed over him, spoke to him in a harsh voice, threaten him or make any promises to him.  T25.  Candanazo did not appear confused, and while Beamish did not recall if Candanazo smelled of alcohol, Candanazo appeared to know where he was and his answers were appropriate to the questions asked.  T25-26.  Engle was not sure when Candanazo's handcuffs were moved to the front or removed altogether.  T112.  It appeared to Engle that Candanazo was under the influence of methamphetamine, because he was having

---

[5]     Although Candanazo withdrew his motion to suppress statements, evidence concerning the government's acquisition of them was presented at the evidentiary hearing.  The Court summarizes the evidence for the benefit of the District Court in the event a question about how Candanazo's statements were obtained arises in subsequent proceedings.

11

trouble maintaining a good attention span and was twitching and agitated, behavior Engle believed was consistent with methamphetamine usage.  T112.  Candanazo admitted using methamphetamine. T112. However, Candanazo was cooperative. T31.

Engle advised Candanazo that they had a search warrant for the residence for methamphetamine, and that he wanted to question him about it, but first had to read him his *Miranda* rights.  T113. Engle asked if he spoke English or Spanish and Candanazo stated he spoke English, and he proceeded to advise him of his *Miranda* rights in English from a pre-printed card.  T26, 68, 113-114; Govt. Exh. 3[6].  Engle sat next to Candanazo as he read him his rights.  T114-115.  Candanazo stated that he understood his rights and wanted to speak with the agents.  T116.  Candanazo was not threatened.

---

[6]     Govt. Exh. 3 provided:

1.     You have the right to remain silent.
2.     Anything you say can and will be used against you in a court of law.
3.     You have the right to talk to a lawyer and have him present with you while you are being questioned.
4.     If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.
5.     You can decide at any time to exercise these tights and not answer any questions or make any statements.

Govt. Exh. 3. Below the warnings was the following waiver: "Do you understand each of these rights I have explained to you?  Having these rights in mind, do you wish to talk to us now.?" *Id.*

AO 72A
(Rev.8/8
2)

T116. While he appeared to be under the influence of methamphetamine, he knew who Beamish and Engle were, he was coherent, he read along while Engle read him his rights, and he did not appear confused.  T117. Candanazo did not state that he wanted to stop answering questions.  T34, 117.  Although Beamish paced, he was not agitated or aggressive.  T118.  Engle's tone with Candanazo was conversational.  T118. Candanazo stated that he moved into the house three weeks ago and slept in the sunroom.  He stated that he smokes methamphetamine.  He also stated that he was given methamphetamine by Villaverde, and he last smoked it at 2:00 that morning. Deft. Exh. 1 at 7.  Candanazo's first interview ended at 6:22 pm.  T27, 69, 111.

The CS, Ephram Villaverde and Nick Pena separately were interviewed.  T28, 120.   Ephram stated that his brother sold methamphetamine out of the house. Deft. Exh. 1.  He also stated that he knew about the delivery of the methamphetamine, but that day was the first delivery he witnessed.  *Id.*

At approximately 6:33 pm, Candanazo was interviewed a second time.  T76, 122-121.  This interview lasted 10 minutes.  T121.  He was re-*Mirandized*, except Group Supervisor Healy read him the rights from Engle's card.  T123.  Again, he was seated on the bed.  T76.  This time, Group Supervisor Healy also was in the room, and stood by the door.  T76-77.  During this interview, Western Union receipts showing

13

that Candanazo wired money to the CS were displayed to him.  T68, 123.  He denied

knowing the purpose of the CS's visit that day, but admitted that he was present in the

backyard after the CS arrived at the house.  He admitted wiring $300 to the CS at

Villaverde's direction on a Thursday and again on January 19, 2010.  Govt. Exh. 1

at 12-13; Deft. Exh. 1 at 7.

Then, at 7:30 pm, Defendant Villaverde was interviewed by Beamish and Engle.

T28, 123.  His handcuffs were moved to his front for the interview.  T125.  Healy also

was present.  Both Beamish and Engle were armed but their weapons were holstered.

As had been the case with the other interviews, the door to the bedroom was closed

during the interview, and Villaverde was seated on the bed.  T29, 126.  At times he laid

back on the bed and rested his head up against the headboard or against the wall

supporting his head with pillows.  T29, 127.  He appeared to be sullen when advised

of the charges.  T124.  Villaverde did not appear to be under the influence of drugs.

T46.

Villaverde acknowledged that he spoke English, and he appeared to be able to

communicate in English and in Spanish.  T30, 48.  Engle read him his *Miranda* rights

in English from Govt. Exh. 3 (*see* note 6).  When Villaverde stated partially in Spanish

that he understood his rights, Engle stopped reading the waiver portion of the rights and

AO 72A
(Rev.8/8
2)

had Beamish then read him his rights in Spanish.  Govt. Exh. 2.[7]  T49, 128.  Villaverde

stated he did not need a lawyer.  T157.  Engle asked him in what language he wanted

to be questioned and Villaverde responded that he preferred English.  T49.  The ensuing

interview lasted 15 minutes.   Beamish described the atmosphere as cordial and

Villaverde as very cooperative.  T31.[8]  Engle described him as "extremely forthcoming,

---

[7]      The English side of the *Miranda* card provided:

Before we ask you any questions, you must understand your rights.

- You have the right to remain silent.
- Anything you say can be used against you in court, or in any immigration or administrative proceeding.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him present during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.
- You also have the right to stop answering at any time until you talk to a lawyer.

Govt. Exh. 2.  Beamish also asked Villaverde in Spanish whether he understood his rights.  Villaverde responded in Spanish that he did, but the subsequent interview was conducted in English.  T31.

[8]      During the investigation in the house, only Charlene asked to use the bathroom, and she was allowed to do so.  T32.

AO 72A
(Rev.8/8
2)

very honest and forthcoming." T155. Villaverde was not threatened nor promised any benefit. T33. Villaverde did not state that he wanted to end the questioning. T34. He acknowledged living at the location and the outbuilding behind the residence was his workshop.   He admitted being responsible for receiving and processing liquid methamphetamine imported from Mexico, in exchange $200-300 per load stipend and relief from a debt he owed in Mexican.   He stated that the source of the methamphetamine was Clemente LNU and that Tio LNU would retrieve the liquid from the house and take it elsewhere.  Govt. Exh. 1 at 12; T123.  Villaverde did not ask to speak to a lawyer during the interview.  T131-132.  The interview concluded at 7:55 pm.

Villaverde and Candanazo were formally advised they were under arrest at the conclusion of all of the interviews.  T133.  Villaverde was returned to the couch until he was transported from the scene.  T159.  Villaverde asked for and was  provided with something to drink before he was transported from the residence.  T32, 51.

While the interviews were being conducted, the other agents were searching and photographing the residence and processing the liquid methamphetamine.  The agents were unsure of the liquid's stability, so they called in the DEA's mobile lab team.

16

T129-130.  The entire process took about two and one-half hours.  T131.  A copy of the search warrant was left with Charlene.  T159.

*Discussion*

(1)    *Motions to suppress evidence, [Docs. 33,41].*[9]

Villaverde first contends that the search warrant was not supported by probable cause because there was no indication that the informant was reliable since the CS had not previously been used by law enforcement.  The Court disagrees, and concludes that the search warrant was more than adequately supported by probable cause.

Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location.  *See United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991).  "[P]robable cause is a fluid concept - - turning on the assessment of probabilities in particular factual contexts[.]"  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis

_____

[9]    The Court assumes that Villaverde had a legitimate expectation of privacy in the residence.

17

of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000). To avoid "rigid" legal rules, *Gates* changed the "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 114 (1964), into a totality of the circumstances test. *See Gates*, 462 U.S. at 230-35. Under the *Gates* totality of the circumstances test, the "veracity" and "basis of knowledge" prongs of *Aguilar*, for assessing the usefulness of an informant's tips, are not independent. "[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]" *Gates*, 462 U.S. at 233. That is, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citing *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)).

The Eleventh Circuit has held that a search warrant affidavit that recites the statements of an informant can provide a substantial basis for a finding of probable cause because " 'an explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the informant's tip to greater

18

weight than might otherwise be the case.' " *United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999) (quoting *Gates*, 462 U.S. at 234).   Therefore, although independent corroboration aids in assessing the informant's veracity, it is not required in every case.  *Id.*  For example, an informant's tip is deemed adequately corroborated when there exists a disincentive for the informant to lie.  *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995) (holding that a tip is corroborated when given in "circumstances under which [the informant] is unlikely to lie" because a falsehood "would likely be discovered in short order and favors falsely curried would dissipate rapidly.").  In *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996), the Eleventh Circuit carefully set out the multitude of factors that must be examined before determining whether the statement of an informant provides probable cause: corroboration of the details of the tip through independent police work; whether the informant has made a statement against his penal interests; whether the informant had personal knowledge; whether there is a past history between the informant and the police department that supports his reliability; whether the police took independent steps to investigate the tip.

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the

19

record supporting the magistrate judge's decision to issue the warrant.  *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984).  "[P]robable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)); because a search is not to be made legal by what it turns up.  *United States v. Di Re,* 332 U.S. 581, 595 (1948).

In this case, the CS's information was more than adequate on its own to support the issuance of the warrant and also was corroborated.  The CS told law enforcement about the CS's own involvement in smuggling quantities of liquid methamphetamine into the United States from Clemente Estrada to Houston and to "Marco Villaverde" in Atlanta.  This information was clearly against the CS own penal interests. " '[A]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility sufficiently at least to support a finding of probable cause to search.' "  *United States Farese*, 612 F.2d 1376, 1378 (5th Cir. 1980) (quoting *United States v. Harris*, 403 U.S. 573, 583 (1971)).

Also, the CS described in particularized detail how the substances were transported and paid for.  The CS described Villaverde's residence and his wife's vehicle.  The CS's information led police directly to the subject residence, where the

vehicle was discovered.  Independent police investigation resulted in facts which demonstrated theat Villaverde's wife was involved in the drug trade.  The officers also observed conduct at the residence which was consistent with how the CS indicated the methamphetamine was delivered at the residence.  *See* ¶¶ 15-17 of the search warrant affidavit, [Doc. 41-3 at 12-13].  In addition to the CS's statements, the CS actually provided law enforcement with a large quantity of the liquid methamphetamine the CS was being paid to transport.  The CS's monitored telephone conversations with Estrada and Villaverde also corroborated her information.  Finally, the CS delivered the liquid methamphetamine to the residence.  These activities in which the CS engaged at the behest of the police bolsters the CS's reliability.  Unlike a source who merely provides historical information, an informant's active assistance exposes the informant to personal danger but also to detection of any previous fabrications.  Therefore, the CS's activities in this case provided a disincentive to lie.  As a result, the CS was reliable and the search warrant was supported by more than adequate probable cause.

Villaverde also argues that the search warrant was invalid because the issue date on the warrant and application was "December 11, 2009."  The Court concludes that the warrant was not rendered invalid simply because the application and search warrant were dated December 11, 2009, as opposed to January 21, 2010.  The evidence

submitted to the Court demonstrates without contradiction that the "December 11, 2009" date was simply a scrivener's error, and that the search warrant was applied for and issued on January 21, 2010.  First, the declaration of ICE Special Agent Andre Kenneybrew, the affiant on the search warrant application, provides that he submitted the application on January 21, 2010, but the face sheets on the application and the warrant incorrectly stated December 11, 2009.  SA Kenneybrew's affidavit shows that the warrant was in fact issued by Judge Hagy on January 21, 2010, at 2:55 pm.  [Doc. 43-2 at 1].

Also, the undisputed evidence before the Court is that the December 11, 2009, error was the result of a scrivener's error which does not invalidate the warrant.  *United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008) ("[T]his Court has explained that when information within a search warrant permits the establishment of intended-but imperfectly scribed-dates, the document is not rendered deficient."); *United States v. White*, 356 F.3d 865, 869 (8th Cir. 2004) (inconsistency between date on warrant application form and date on search warrant does not eliminate probable cause); *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994) ("Warrants have been upheld despite 'technical errors,' . . . when the possibility of actual error is eliminated by other information, whether it be . . . supplemental information from an appended affidavit,

22

or knowledge of the executing agent derived from personal surveillance of the location to be searched."); *United States v. Lowe*, No. 08-CR-340, 2009 WL 723344, *1 (E.D. Wis. Mar. 17, 2009) ("[I]t is apparent that the fact that the wrong month was typed into the jurat of the affidavit submitted in support of the warrant application was a mere scrivener's error."). In this case, the affidavit described events which occurred days and weeks after December 11, 2009. Therefore, the application could not have been submitted on that date.

*Groh v. Ramirez*, 540 U.S. 551 (2004), relied upon by Villaverde, does not compel a different result. In *Groh*, the warrant (as opposed to the warrant application) was declared invalid because it utterly failed to describe the persons or things to be seized. Here the warrant contained a detailed description of the place to be searched and the items to be seized.

Therefore, the warrant was not rendered invalid as a result of the scrivener's error described above.[10]

---

[10] Even if the warrant was somehow rendered invalid by this scrivener's error, the undersigned concludes that suppression would not be mandated as a result of the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984). *See United States v. Galbert*, 248 F.3d 1144 (5th Cir. 2001) (unpublished) (where affidavit and warrant contained signing date of March 8, 1999, but where evidence demonstrated they were signed on April 8, 1999, good faith exception applied).

23

In addition, the search was not invalidated because the executing agents did not have the warrant in their possession at the time it was initially executed. Villaverde has the burden of establishing that the search warrant was improperly executed. *United States v. Marx*, 635 F.2d 436 (5th Cir. Unit B Jan. 27, 1981)[11] (citing *United States v. Vigo*, 413 F.2d 691, 693 (5th Cir. 1969)). In *Marx*, the defendant argued that the search was invalid because the agents did not leave a copy of the warrant and because the warrant was not physically present at the time and location of the search. The *Marx* Court rejected the challenges, holding that at most there was a violation of Rule 41 of the Federal Rules of Criminal Procedure, and in order to show a violation, the defendant failed to demonstrate how he was prejudiced either by being subjected to a search that might not have occurred or would not have been so abrasive had Rule 41 been followed. *Marx*, 635 F.2d at 440 (citing *United States v. Burke*, 517 F.2d 377, 386 (2d Cir. 1975)).

Likewise, Villaverde has not satisfied his burden to show that the search would have been conducted differently had the search warrant been physically present at the location. The search warrant authorized the search of any outbuildings, and there was

---

[11]    The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

24

probable cause to believe that the outbuilding was being used as part of the drug distribution activities.  In any event, a search of a residence pursuant to a warrant may include all other buildings and all other objects "within the curtilage of that residence," even if not specifically referenced in the search warrant.  *United States v. Cannon*, 264 F.3d 875, 881 (9th Cir. 2001).

In addition, the evidence demonstrates that while Kenneybrew applied for and received the search warrant, Engle had drafted the search warrant.  Deft. Exh. 1 at 5. Therefore, as one of the two lead agents on the scene, Engle would have had knowledge of the contents of the warrant and its scope.

As a result of the foregoing, the undersigned **RECOMMENDS** that Villaverde's motions to suppress evidence, [Docs. 33,41], be **DENIED**.

(2)      *Motion to suppress statements, [Docs. 31, 33, 41].*

Villaverde argues that his statements were improperly obtained.  He first contends that he was arrested without probable cause and that, as a result, his statements were unlawfully obtained as fruits of his unlawful detention.   The government bears the burden to demonstrate the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991).  A warrantless arrest is constitutionally valid only when there is probable cause to arrest.  *See United States v. Watson*, 423 U.S. 411, 417 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982).  Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149 (1972).  In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life

26

on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S.

at 229-31 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).   "The

substance of all the definitions of probable cause is a reasonable ground for belief of

guilt, and that the belief of guilt must be particularized with respect to the person to be

searched or seized."   *Maryland v. Pringle*,   540 U.S. 366, 371 (2003) (internal

punctuation marks and citations omitted).   However, an officer is not required to

resolve all inferences and all factual conflicts in favor of the suspect.   An officer's

decision to arrest a suspect may be objectively reasonable even though that officer has

not specifically discarded every possible non-criminal explanation for the conduct that

forms the basis for her decision to arrest a suspect.   *Bailey v. Board of County Com'rs

of Alachua County, Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v.

Pantoja-Soto*, 739 F.2d 1520 (11th Cir. 1984).   Officers may rely on information

received from an "identified bystander or victim-eyewitness to a crime." *United States

v. Martin*, 615 F.2d 318, 325 n.9 (5th Cir. 1980) (quoting *United States v. Bell*, 457 F.2d

1231, 1238 (5th Cir. 1972)).[12] Such persons are deemed generally reliable because they

"are not 'intimately involved with the persons informed upon and with the illegal

---

[12]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en
banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

conduct at hand' as other informants often are." *Id*.  Moreover, when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause.  *United States v. Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002);  *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1992); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984).

The Court's focus must be not upon each fact in isolation but " 'the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers.' "  *Wilson*, 894 F.2d at 1254 (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), and *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966)).  To determine whether an officer had probable cause to arrest an individual, the Court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.  *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Most of Villaverde's arguments are focused on the lack of reliability of the CS, which the Court rejected above in relation to Villaverde's attack on the sufficiency of the search warrant.  These arguments, and the Court's rejection of them, need not be

28

repeated here.  Simply stated, probable cause to arrest Villaverde was established based on the CS's information that Villaverde was Estrada's recipient of liquid methamphetamine, which information was corroborated by (1) monitored/recorded phone conversations between Villaverde and the CS, (2) law enforcement observations of the activity at the residence (including but not limited to the Jeep Liberty and Honda on January 5-6, 2010), (3) delivery of liquid methamphetamine by the CS to the residence on January 21, 2010, followed by the CS's vehicle being moved to backyard where persons gathered around it, and (4) discovery of the liquid methamphetamine in the outbuilding of the residence.  In addition, additional evidence establishing probable cause to arrest Villaverde included his wife Charlene's statements acknowledging Villaverde's distribution of methamphetamine and describing the outbuilding as his "man cave," (Deft. Exh. 1 at 7); Candanazo's statements that he was supplied methamphetamine by Villaverde and that he was given the money to wire to the CS and that he wired the money to the CS at Villaverde's direction, (*id.*); and  Ephram Villaverde's statements that Defendant Villaverde sold methamphetamine out of his house and that the liquid methamphetamine was delivered to that location.  Therefore, Villaverde's arrest was properly supported by probable cause and his resulting statements were not tainted by an unlawful arrest.

29

Villaverde next argues that his *Miranda* waiver and subsequent statements were involuntary.  In support, he cites to the force used to arrest him, particularly the facts that a dozen officers entered his home with weapons, including "long guns," drawn; his child was screaming; the agents displayed no search warrant; he waited two hours to be questioned, and while he waited he was handcuffed and guarded by armed agents; he was interrogated in a small room in the presence of three armed officers; and he was questioned in his non-native language.  [Doc. 79 at 24-30].

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.

Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).  The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily.  *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).  To meet its burden, the government may not rely on "presumptions

30

or inferences that when police officers read to an accused from a card they are reading *Miranda* warnings or that what is read, without revelation of its contents, meets constitutional standards." *Moll v. United States*, 413 F.2d 1233, 1238 (5th Cir. 1969). However, the government does not rely merely on "a presumption" if the defendant admits a warning was given and the arresting officer testifies that he read from a card containing "the standard *Miranda* warnings." *See United States v. Klein*, 592 F.2d 909, 914 (5th Cir. 1979).  Although the Government has a "heavy burden" to prove that a defendant's waiver of his privilege against self-incrimination was voluntarily, knowingly and intelligently made, *Miranda*, 384 U.S. at 475, which entails the proving of a person's subjective state of mind, the Court must rely on the objective indicia of a defendant's mental state in order to determine whether a voluntary, knowing and intelligent waiver was made.  These objective indicators are that the defendant was informed in clear and unequivocal terms of each of his *Miranda* rights and that the defendant said, or by his conduct indicated, that he understood them and wished to waive them.  *United States v. Sonderup*,  639 F.2d 294, 297-98 (5th Cir. 1981).

An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness

31

of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *Id.*

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has

32

"enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

Both Villaverde's waiver of his *Miranda* rights and his subsequent statements were voluntary.  First, as to his *Miranda* waiver, the undisputed evidence shows that Villaverde was read his *Miranda* rights from a preprinted card in English and in Spanish.  Although English may not have been Villaverde's native tongue, the evidence is uncontradicted that Villaverde chose to be interviewed in English and that he spoke English.  The evidence similarly is undisputed that Villaverde stated that he understood

33

his rights and did not wish to have a lawyer present, thus indicating that he understood the rights he was giving up.  As a result,  the Court finds that Villaverde was aware of and understood his *Miranda* rights.

The circumstances of his waiver demonstrate that he voluntarily waived those rights because there is no evidence of any coercion that affected his free choice to waive his rights.   Although he had been held in handcuffs and in custody for approximately two hours before he was brought into the bedroom and *Mirandized*, during the time he was being held, he was located on the couch in his own living room or at his own kitchen table.  While guarding agents were armed, there is no evidence that they brandished the weapons at him while guarding him or otherwise mistreated him.  While he was handcuffed, the mere act of handcuffing did not make his waiver or subsequent confession involuntary. *See Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir. 1983) ("The use of handcuffs does not establish coercion.").

In addition, the atmosphere which Villaverde complains was so coercive, including the numerous armed agents storming the house, the agents shouting at the occupants, and his young child crying, even if sufficient to constitute some sort of coercion, had dissipated long before the time Villaverde was read his rights and questioned.   The undisputed evidence is that while Villaverde's child had been

34

distraught, the child had calmed down long before Villaverde was interviewed.  The evidence demonstrates that the child had been willingly carried about the house by Agent Beamish and then was turned over to the child's mother.  Also, once the scene was secured, the agents spoke in conversational tones, took off their raid jackets revealing plain clothes, holstered their sidearms and put away the long guns.  Although the record does not state when a copy of the search warrant was brought to the residence, a copy was left with Charlene when the agents finally left, indicating that at some point the occupants of the house were advised that the entry into the location had been authorized by a judicial officer.  Also, the Court gives some weight to the fact that Engle and Beamish told Candonozo that they had a search warrant.  It therefore is unlikely that they would not similarly advise Villaverde of this fact.

Therefore, the Court finds that Villaverde voluntarily and without coercion waived his *Miranda* rights.

The same lack of coercion is reflected in the circumstances of Villaverde's statements, demonstrating that they were voluntarily made.  Although the record is silent as to Villaverde's education level or intelligence, the evidence demonstrates that he was passably bi-lingual, showing at least average intelligence.  While he had been detained for two hours before being interviewed, the detention was (1) authorized due

35

to probable cause, (2) on the couch in his own living room or at his own kitchen table; and (3) without any physical coercion against him other than being handcuffed and ordered to stay put. The record also demonstrates that he was interviewed in a bedroom in his own home, where he was seated on the bed and at times laid back against pillows or the headboard, conduct which reflects an attitude inconsistent with coercion. His complaints of either being warm because he was wearing a jacket or uncomfortable due to the placement of his handcuffs were addressed. T124-125. The interview was not lengthy, and he was described as being extremely forthcoming. No physical force beyond the initial arrest was used against him.[13] Nor did the interviewing agents make any promises or inducements or threaten him.

    As a result, the Court finds that Villaverde's statements were voluntarily obtained. Therefore, the undersigned **RECOMMENDS** that Villaverde's motions to suppress statements, [Docs. 31, 33, 41], be **DENIED**.

---

    [13]    As the Former Fifth Circuit indicated in a case involving voluntary consent, in any arrest there is present a degree of duress. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent. *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973). In this case, that question is answered in the negative.

36

*Evidence obtained from the 2008 traffic stop which the government intends to introduce under FED. R. EVID. 404(b), [Doc. 40].*

On August 13, 2010, the Court was to hold an evidentiary hearing on Defendant's motion to suppress evidence seized on January 3, 2008, in Paulding County from a Yukon truck in which Villaverde was a passenger. The government objected to the hearing on the ground that Villaverde did not have a personal expectation of privacy in the vehicle. [Doc. 66]. In its opposition to the hearing, the government argued that the evidence at the hearing would demonstrate the following:

> In January of 2008, Haralson-Paulding Drug Task Force Agent Joey Horlsey (Agent Horsley) was working with a reliable confidential informant who had supplied information that led to at least two other methamphetamine seizures and arrests. The informant reported owing debts for past drug transactions to an individual known only as "Charlie" and claimed that Charlie had kidnapped him/her at gunpoint on or about January 2, 2008. According to the informant, despite this debt, Charlie remained willing to sell additional methamphetamine to the informant. The informant further indicated that Charlie, who had drug customers in Paulding County and commonly carried multiple ounces of methamphetamine with him, drove several cars including a dark colored Yukon with after[-]market rims.
>
> At Agent Horsley's request, the informant telephoned Charlie and asked that Charlie deliver drugs to Paulding [C]ounty. After multiple telephone conversations between Charlie and the informant, at least one of which pertained to the informant's debt, Charlie agreed to come to a Paulding County Waffle House restaurant with up to three ounces of methamphetamine.

37

With Paulding County Sheriff's Office Sergeant J. Ritch (Sgt. Ritch) and Deputy Billy Hurst (Dep. Hurst) nearby, Horsley and the informant went to the area of the meeting to look for Charlie. Upon arriving, the informant identified a purplish brown Yukon with after[-]market rims (the Yukon) registered to Juan Salas-Villegas (Salas) parked in an Auto Zone store parking lot as Charlie's truck. The informant further reported that Charlie ordinarily kept drugs underneath the Yukon's center console. As the law enforcement officers watched, they saw an individual ultimately identified as Salas get into the Yukon's driver's seat and a second individual ultimately identified as the Defendant [Villaverde] get into the passenger's seat. After the Yukon pulled out of the Auto Zone parking lot, Sgt. Ritch, who was aware of the information the informant's statements and activities, saw that a video screen was on and visible to Salas and noticed that one of the Yukon's tail lights bore red tape.

Thereafter, Sgt. Ritch stopped the truck, and he and Deputy Hurst greeted Salas [and] the Defendant, respectively. During the interaction, the Defendant contended that he did not speak English.

Within approximately six minutes of turning on his blue lights to stop the Yukon, Sgt. Ritch obtained the driver's consent to search the truck. Within approximately seven minutes of Sgt. Ritch activating his blue lights, both Salas and Vill[averde] were standing in front of Sgt. Ritch's patrol car while Sgt. Ritch searched. Finally, within approximately eight minutes of Sgt. Ritch activating his blue lights, Sgt. Ritch found suspected methamphetamine and a pipe underneath the Yukon's center console and placed both Salas and the Defendant under arrest.

[Doc. 66 at 2-3].

Villaverde states that he is entitled to a hearing on his motion to suppress for two reasons. First, he argues that under *Brendlin v. United States*, 551 U.S. 249 (2007), as a passenger in Salas' vehicle, he has standing to challenge the stop and search of it.

38

Second, he argues that even if he does not have standing to challenge the search of the vehicle, he has the right to challenge the government's assertion that it was relying on Salas' consent to the search of the vehicle, because the facts might turn out that the vehicle was searched subject to Villaverde's lawful arrest.  The Court rejects each argument.

First, the Eleventh Circuit in an unpublished opinion recently addressed the factual circumstances and legal arguments presented here:

> A party seeking to challenge a search on Fourth Amendment grounds must establish that he has a legitimate expectation of privacy in the searched area.  *Rakas v. Illinois*, 439 U.S. 128, 143-44[ ] (1978).  "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. [(2008).] "[A] passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009)[ ] (quotation omitted).
>
> The district court correctly held that Ubaldo-Viezca lacked standing to challenge the search of the vehicle and trailer.  Because Ubaldo-Viezca was merely a passenger and did not own or rent the vehicle, he could not raise a Fourth Amendment challenge to the search of the vehicle. *See Lee*, 586 F.3d at 864.  Furthermore, since Ubaldo-Viezca did not have a legitimate expectation of privacy in the vehicle in which he was riding, it follows that he also did not have a legitimate expectation of privacy in the trailer, owned by Garcia, that was being pulled behind that vehicle. *See id.*; *Harris*, 526 F.3d at 1338.  Although Ubaldo-Viezca appears to argue

AO 72A
(Rev.8/8
2)

that the Supreme Court, in *Brendlin v. California*, 551 U.S. 249[ ] (2007), held that passengers have standing to challenge vehicle searches, *Brendlin* addressed a passenger's standing to challenge the constitutionality of the initial traffic stop, rather than the search of the vehicle in which he is riding. *See Brendlin*, 551 U.S. at 254, 256-58[ ]. Accordingly, the district court did not err in finding that Ubaldo-Viezca lacked standing to challenge the search of the Expedition and trailer.

*United States v. Ubaldo-Viezca*, No. 09-16341, 2010 WL 3895710, *5 (Oct. 6, 2010).

Although an unpublished decision, the *Ubaldo-Viezca* opinion is strong evidence that the Eleventh Circuit would reject Villaverde's argument that *Brendlin* in effect overruled, *sub silentio*, approximately 30 years of Fourth Amendment jurisprudence and restored a passenger's right to challenge the search of a vehicle in which he otherwise did not have a legitimate expectation of privacy.

Further, the majority of courts that have considered the issue has concluded that *Brendlin* does not modify *Rakas v. Illinois,* 439 U.S. 128 (1978), as it related to a passenger's standing[14] to contest the search of another's vehicle. *See United States v. Spotted Elk*, 548 F.3d 641, 657 (8th Cir. 2008) (rejecting argument that *Brendlin* stands

---

[14]     The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing." *See Rakas*, 439 U.S. at 139-40; *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

"for the proposition that a person who was a passenger in the past retains standing to challenge future searches of someone else's car"); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1150 (9th Cir. 2007) (noting that defendant lacked standing after *Brendlin* to challenge the search of another's car, but has standing to object to stop of the vehicle and request for his identification and license check, since "[t]h[o]se actions were directed at Diaz-Castaneda himself, rather than Diaz or Diaz's vehicle, and hence do not come under *Rakas*"); *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (affirming district court's conclusion that defendant passenger lacked standing to challenge search of vehicle, only "evidence discovered as fruit of an unlawful detention"); *United States v. Martinez*, 537 F. Supp. 2d 1153, 1156 (D. Kan. 2008) (holding that a passenger's standing to object to search of vehicle remains subject to *Rakas* analysis, and citing *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007)); *see also United States v. Monroe*, Nos. 08-5050, 08-5051, 08-5052, 2010 WL 3721524 (4th Cir. Sept. 20, 2010) (observing that while *Brendlin* gave defendant standing to challenge traffic stop, "he had no right under the Fourth Amendment to challenge the ensuing search of the vehicle because he lacked a legitimate expectation of privacy with respect to the vehicle that belonged to its driver"); *United States v. Cruz-Chavez*, No. 10-40055-01/02-RDR, 2010 WL 3270106,

41

*5 (D. Kan. Aug. 17, 2010) (holding that "the passenger's right to contest a subsequent search not of his or her person but the vehicle remains subject to analysis under *Rakas*"); *United States v. Ochoa-Mata*, No. CR 09-0146-TUC-FRZ(HCE), 2009 WL 2134357, *7 (D. Ariz. June 16, 2009) (noting defendant's standing to challenge stop of vehicle but not to challenge the search of the vehicle "because Defendant does not have a possessory or ownership interest nor a legitimate expectation of privacy in the silver sedan"); *United States v. Holmes*, No. 3:08-cr-129, 2009 WL 136684, *12 (E.D. Tenn. Jan. 16, 2009) (same); *United States v. Gaxiola-Burboa*, No. 06-8120, 2008 WL 4531689, *3 (D. Ariz. Oct. 9, 2008) (noting that *Brendlin* did not undermine *Rakas* because the *Brendlin* Court specifically stated that Brendlin did not assert that his Fourth Amendment rights were violated by the search of the driver's vehicle); *United States v. Lewis*, No. 3:07-cr-112-J-33TEM, 2008 WL 552551, *5 (M.D. Fla. Feb. 27, 2008) (holding that defendant only had standing to challenge stop, not search, of vehicle). *But see United States v. Robinson*, No. 1:08-CR-74-TS, 2009 WL 2106147, *13 n.4 (N.D. Ind. July 13, 2009) ("The Court agrees with the Defendant that he has standing to challenge the search of the vehicle even though it was not his vehicle and he was not the driver. *Brendlin* [ ] (ruling that

a passenger is seized during a traffic stop and "may challenge the constitutionality of the stop).").

Second, the Court rejects Villaverde's argument that the evidence could demonstrate that Salas' vehicle was searched not pursuant to the driver's consent but incident to Villaverde's arrest, since it might turn out that the evidence seized was within his arm's reach. First, Villaverde's motion contains no such allegation. "[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)). "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . . A court need not act upon general or conclusory assertions. . . ." *Id.* at 1284 (quoting *United States v. Richardson,* 764 F.2d 1514, 1527 (11th Cir. 1985) (internal citations omitted)). In fact, the only evidence in the record belies this theory, because Villaverde was not inside the vehicle at the time of the discovery of the narcotics and paraphernalia which gave rise to probable cause for his arrest.

43

Second, and consistent with these principles, a defendant is not entitled to an evidentiary theory on the grounds that "we'll see what turns up."

As a result, the undersigned **RECOMMENDS** that Villaverde's motion to suppress evidence the government seeks to introduce as Rule 404(b) evidence, [Doc. 40], be **DENIED** without an evidentiary hearing as to any Fourth Amendment claim.[15]

### *Motion to sever defendants, [Doc. 34].*

As noted above, when interviewed following his arrest, Candanazo made statements which implicated Villaverde. Villaverde moved for a separate trial under *Bruton v. United States*, 391 U.S. 123 (1968), and other grounds. [Doc. 70]. In response, the government proposed that Candanazo's statements be redacted to state as follows:

> During the first statement, Candanazo said that he moved to the Ridgecrest residence approximately three weeks earlier, that he was a self-employed construction worker, that he smoked methamphetamine, that the last time he had smoked the drug was at approximately 2:00 a.m. ~~when he smoked crystal methamphetamine that Villaverde supplied~~, and that he had been in the back yard when the Jeep arrived.

---

[15]    The Court expresses no opinion whether the evidence resulting from the Paulding County seizure is admissible at Villaverde's trial on Rule 404(b) grounds, because that issue was not before the Court.

44

> During Candanazo's second statement, he told law enforcement officers that he ~~accompanied Villaverde~~ [*add* went] in the Chevrolet Tahoe on January 14 and January 20, 2010, to wire $300 to the confidential informant, ~~that he received those funds from Villaverde, that he wired them at Villaverde's direction~~, that he sent the money via Western Union, and that the purpose for wiring the money was to enable the informant to "get up here in the Jeep."

[Doc. 70 at 1-2]. Villaverde still objects to these redactions on the ground that Candanazo's reference to the Tahoe necessarily implicates him since the vehicle was registered to his wife and the Western Union receipt was found in the Tahoe.

In *Bruton*, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that facially incriminate other defendants are inadmissible into evidence because such statements violate the other defendant's Sixth Amendment rights to confront and cross-examine adverse witnesses. The Supreme Court concluded that "where the powerfully incriminating extra-judicial statements of a co-defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. *Bruton*, 391 U.S. at 135-36.

In *Richardson v. Marsh*, 481 U.S. 200 (1987), however, the Supreme Court had occasion to consider whether the confession of a non-testifying co-defendant admitted during a joint trial that had been redacted to omit the names of all co-defendants

45

violated the rule established in *Bruton*.  In that instance, the Court refused to apply *Bruton* and concluded that "the Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with the proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Richardson*, 481 U.S. at 211.  The Court concluded that in such a situation, the confession is not so "powerfully incriminating" that a limiting instruction given by the district court could not effectively eliminate any prejudicial effect to the co-defendants.  *Id.* at 208.  The *Richardson* Court, however, "expressed no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."  *Id.* at 211 n.5.

That was an issue subsequently addressed by the Supreme Court in *Gray v. Maryland*, 523 U.S. 185 (1998).  In *Gray*, the Court, applying *Bruton*, held that the redaction of the defendant's name from a confession of a co-defendant by substituting a blank space or the word "deleted" for the defendant's name, did not adequately protect a defendant's Sixth Amendment rights to confront witnesses.  The *Gray* decision distinguished that factual scenario from the redaction in *Richardson*, 481 U.S. at 203-204 , where the redaction omitted any mention of the co-defendant then on trial in the involvement of the crime.

46

In *Gray* , a confession written by a co-defendant that explicitly referred to the defendant was redacted to eliminate any reference to the defendant.  However, the defendant's name was replaced with the word "deleted" or was simply left as a blank space. *Gray* , 523 U.S. at 188.  When the government's law enforcement witness read the co-defendant's confession into evidence, he said "deleted" wherever the defendant's name had been redacted.  The witness then testified that following the receipt of the co-defendant's confession, he arrested the defendant.  The Supreme Court concluded that the "obviously redacted confession" violated *Bruton* because it "pointed directly to the defendant." *Id.* at 194.  Thus, the Court concluded that the redacted confession "facially incriminated" the defendant and "involved inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.*  In reaching this conclusion, the Court distinguished its decision in *Richardson* where the redacted confession "became incriminating 'only when linked with evidence introduced later at trial.' " *Id.* at 196 (quoting *Richardson*, 481 U.S. at 208).

The government's redactions of Candanazo's statements to eliminate any reference to Villaverde satisfies the aforementioned principles.  The statements no longer facially incriminate Villaverde, and instead "bec[o]me incriminating 'only when

47

linked with evidence introduced later at trial.' " *Id.*  As a result, Villaverde is not entitled to a severance under *Bruton* if the government introduces Candanazo's statement in the redacted form proposed in Doc. 70.

As for Villaverde's other contentions in support of severance - - antagonistic defenses and Candanazo's agreement to testify in Villaverde's favor at a separate trial - - they are insufficient because he has not shown that his defense is antagonisitc with Candanazo's, or that Candanazo is willing to offer specific and exonerative testimony in his favor but only at a separate trial.  Separate defenses among defendants do not require severance unless "the jury, in order to believe the core of testimony offered on behalf of [a] defendant must necessarily disbelieve the testimony offered on behalf of his co-defendant."  *United States v. Garate-Vergara*, 942 F.2d 1543, 1552 (11th Cir. 1991) (internal quotation marks and citation omitted).  Villaverde has not shown that his and Candanazo's defenses will be irreconcilable or mutually exclusive at this point.

As to the desire for Candanazo's exculpatory testimony at trial, Villaverde must first demonstrate:

> "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial."  *United States v. Cobb*, 185 F.3d 1193, 1197 (11th Cir. 1999) (citations and quotations omitted).  [Eleventh Circuit] cases examining

48

severance motions based on the need for a codefendant's exculpatory testimony "have often looked hard at the substance of the affidavits proffered by the co-defendant who purportedly would testify in a separate trial." [*United States v. Novaton*], 271 F.3d [968,] 989 [(11th Cir. 2001)]. Moreover, "statements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance." *Id.* at 990.

*United States v. Arneth*, 294 Fed. Appx. 448, 451 (11th Cir. 2008). Villaverde has not come close to satisfying these requirements.

Therefore, for the foregoing reasons, Villaverde is not entitled to a severance from Candanazo as long as the government redacts Candanazo's statement as it indicated it would in Doc. 70. Villaverde also is not entitled to a severance because he has not shown that Candanazo is willing to offer specific and exonerative testimony in his favor but only at a separate trial.

### Conclusion

For all the above and foregoing reasons, the undersigned **RECOMMENDS** that the District Court **DENY** Marciel Villaverde-Leyva's motion to suppress statements, [Doc. 31]; motion to suppress evidence and statements, [Doc. 33]; motion to sever Defendants, [Doc. 34]; motion to suppress evidence and statements (Rule 404(b)), [Doc. 40]; and supplemental motion to suppress evidence and statements, [Doc. 41].

49

In addition, since Adrian Candanazo's motion to suppress statements, [Doc. 25], was withdrawn on October 12, 2010, [*see* Doc. 76], the Clerk is **DIRECTED** to **TERMINATE** that motion.

The Court has now ruled on all pretrial motions and has not been advised of any impediment to the scheduling of a trial.  Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED, DIRECTED and CERTIFIED**, this the 8th day of December, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

50